Our next case is Axe v. Norfolk Southern Railway Company, 511-0277. We have Mr. Schmeller for the appellant, Mr. Reitz. Am I saying that right? Yes, sir. Thank you. I didn't realize it's Reitz or Reitz, but it's Reitz. It's not, but we... Okay. Chancellor, you may proceed. May I please report? Good morning. This is a repetitive trauma case. The allegation in this case is that from 1969, when the appellant started working for the railroad, predecessor to this railroad, until sometime in the 1990s when the practice was outlawed or abolished, the appellant was required to get on and off of moving equipment. So literally, he had to jump off of rail cars onto the ballast and vice versa, and that was a required part of his job. The record before this court is pretty minimal. The case was filed August 23, 2010. This appellant retired from the railroad in August of 2002. In 2003, he had some treatment on his right knee, and there's a note in the file that he had osteoarthritis to the knee and also that he had an arthroscopic surgery some ten years ago to the right knee. That was from a traumatic injury. It has nothing to do with this case. In June of 2004, he went back to the doctor for his knee pain and said he's had it for six to eight months. In July of 2004, he went to the doctor complaining of bilateral knee pain and the doctor's note says it's been going on for years, presumably back to those visits in 2003, but you really can't tell from the record. At that July 24, 2006 visit, the appellant told his doctor, it's in the records, that he worked as a conductor on the railroad and that he was retired. In August of 2006, he had his left knee replaced, and finally in November of 2009, he kept going back to the doctor and then had his right knee replaced. The appellant's affidavit in this case says the doctor did not tell him that the knee injuries were caused by his work. He did not know they were caused by his work. Until 2009 or 10, when he was talking to some fellow retirees and they were talking about knee injuries being caused by work. Is there anything in the record that he inquired of his doctor? Specifically, can you tell me what this is about? You cannot tell from the record whether that was done or not. It does not say in his affidavit that he inquired. Did he get second opinion? He's treated with not only his primary care but also a specialist, a knee doctor. The record where he says he was a conductor is from his primary care doctor. The test that's set forth is a two-pronged test, and it's whether a reasonable person knows or should have known one, the injury, and two, of its governing cause. Obviously, here we're talking about the second prong. He was going to the doctor. He knew he was injured. The circuit court found, and I'm quoting, had the plaintiff exercised the duty to investigate the cause of his degenerative disease as a reasonably diligent person would do, he would raise his suspicions with the doctor. In this case, I think the circuit court's wrong for two reasons. The first one is he did investigate. He went to his doctor. He went to a specialist. Do you agree that the case law does impose upon him a duty to investigate? Yes, but the question... So you're not quibbling with the law? No. You're arguing the facts as to whether he did investigate. I think the question is more, what is that duty? Does he have to go read medical journals? Does he have to get on the Internet? Or is going to a doctor investigating? And I think in this case, his going to a doctor, telling him what he did for a living, he's retired at the time, is investigation. The second reason the circuit court is wrong is that it makes a very large presumption. That presumption is, had the appellant said to the doctor, whether the specialist or the treater, what caused my knee problems? The decision has to presume that the doctor would have said, your work did. And I can tell this court that having done hundreds of depositions of treating doctors in these repetitive trauma cases, that doesn't happen all the time. There's plenty of doctors who are unwilling to say your knee problems are caused by work. The railroad, in this case, argues, or answers in its complaint, that there's a causation problem. There is no causation. The railroad raises two affirmative defenses. One is that it was caused by things other than work. And the second one is that he had a pre-existing condition. The railroad will argue in this case, and many doctors will say the same thing, your knee problems can be caused by genetics, by being overweight, by being diabetic, by having gout, and plenty of other things. I guess the point I'm trying to make is, I think, expecting a railroad worker to surmise, hey, my knee injury is caused by work, is a pretty large expectation. I want to make sure there's a couple things I'm not saying. One is, if the doctor had said, hey, it could have been caused by all those things I just mentioned, genetics, overweight, what have you, or it could have been work, then I think the statute starts to run. But that's not in our record. The second thing that I'm not saying is that he has to have actual knowledge, because the case law says he does not. So if the plaintiff were deposed and he said, you know, I was kind of thinking about it, and I thought, that might be caused by work, or he had some other condition, but he mentioned it, I think the statute would start to run then, too. But again, that's not the case here. I just don't recall from the facts. Is the doctor who is now prepared to testify that it was caused by work the same doctor who was treating him back before? We're not that far in the record. All we have is the doctors weren't deposed. The motion was filed real early in the case. So all we really have is the records. So we don't know today whether his treating doctors would say that it was caused by work. That's correct. Is there anything in the record that his treating doctor was aware of his employment at the railroad? Yes, sir. Specifically in the record it says the plaintiff or the appellant told the doctor, I was a conductor on the railroad from 1969 on, and I'm retired. That's the only thing we have. Was there anything that said in my job I had to get on and off the railroad often times because that's usually the cause of this? Yeah, there's nothing in the record that says that one way or the other. It's just not there. Again, I think the real issue is how far does this duty to investigate go? And, again, if we expect a railroad worker, lifelong railroad worker, to know or assume that his knee injury is after he's retired because the pain, as he relates to his doctor, starts a year after he's retired in 2002. The railroad in this case relies upon a couple of cases. One is I think it's Fry's. It's either Fry's or Fry's. I'm not sure which way to pronounce it. That case is completely different from this case because in that case, the railroad worker had a hearing loss. He knew he had hearing loss for years. His wife says he's had hearing loss for years and had problems. And that railroad worker simply did not go to a doctor. He just put it off. It was never diagnosed. I think that's almost more a first prong, maybe both, than it is a second prong, ruling. The other case the railroad relies upon is a case called Tolsten. It's from 1996 in the Seventh Circuit. In that case, the railroad worker had several falls in the late 70s, early 80s. She'd been going to a doctor, getting pills for her knee problems. She went back in 1984. She went back in 1989, and she was told she had a degenerative knee condition. She kept going in 1990 and 1991, and finally in 1992, a specialist told her that her problems might be caused by her work. In that case, the court held that from an objective standpoint, the plaintiff was required to make an investigation into the potential causes of her injury. In this case, again, I think it's a different set of facts. We have a retired man. He's been off the railroad for at least a year when he goes to the doctor. There's nothing in the record that says he had any knowledge it was caused by work. And unlike the plaintiff in Tolsten, it didn't keep getting worse and worse as he worked. He was done working when it revealed itself. I have to say, I think the Tolsten decision goes pretty far out of the ledge with this duty to investigate. They're kind of pushing further and further what this FELA plaintiff has to do to investigate. I think the decision really pushes it. And I think the Seventh Circuit's later cases, specifically Green, which is a 2005 case, pulls back. In this Green case, the plaintiff had shoulder problems since 1988. She told the doctor in 1993 that she had shoulder discomfort and she may have sprained her shoulder at work. In 1997, a coworker wrote a letter of complaint to the railroad saying that he and Ms. Green and some others were experiencing shoulder problems and they thought they were caused by work. The court, the Seventh Circuit, ruled that despite the complaint letter and despite the visits to the doctor, that Green had sufficient evidence to create a genuine issue of material fact. I think that in Tolsten, Green, I'm sorry, they distinguish Tolsten by saying it's a minor, it may have been a scratch, we can't tell from the record. As I read the case, I almost think it's a distinguishing without really anything to distinguish. I think they're pulling back from this duty to investigate, to be pushing it out that far. There's a case that we did not cite in our brief called Williams. It's from the Federal District Court in Fort Wayne on this exact issue. In that case, the plaintiff had told her doctor about numbness in his hands and kept going back to the doctor. The doctor at one point said, 80% of my job I do with my hands and my shoulders. Is this a new case and you're going to file a motion? I will, yes, Your Honor. Because your opponent would not have the opportunity. I did discuss it with him yesterday when I filed the case. Thank you. That court distinguished Tolsten and Fries by saying this isn't a case where the plaintiff had an injury for a long time and never did anything about it. The court went on to say, and I think this is the most important part, There is no evidence that the plaintiff was aware and reasonable diligence does not require scouring through medical reference books. And I think that's the pulling back from this Tolsten case. The long and the short of it, this activity of getting on and off moving equipment was terminated by the railroads. But when they terminated it, they of course didn't tell their employees we're doing this because it's hurting your knees or other body parts. They knew about it. They stopped the activity, but they didn't do anything further to inform their people. And again, in this case, their argument is there's no causation. Unless you have questions, I'll sit down. I have an opportunity to provide. All right. Your Honor, may it please the court, Mr. General. My name is Curt Rice and I represent American Premier Underwriters, which is Penn Central, Conrail, and the Norfolk Southern Railway Company. And those are the railroads that this gentleman worked for from 1969 up to August 1st, 2002 when he retired. A couple of things by way of background since the plaintiff mentioned it. Number one, the plaintiff is from Michigan. And the reason why this motion was filed early is because the plaintiff is from Michigan and there was a foreign non-convenience motion on file. And the Illinois Supreme Court law on this says we have to raise the summary judgment now or else it's waived. And so that is the reason why it was raised. And that's why we're here at this early stage. Also, there's no jumping on and off railroad trains at any railroad that I'm aware of. What the rule is, is you can get on and off slowly moving trains at the employee's discretion. It's something the union's actually bargained for. The two class one railroads still do it. So nobody's jumping on and off trains. In this particular case, Judge Muzz in Madison County went faced with overwhelming medical records detailing all kinds of evidence, which we'll talk about. And none of it's disputed. There's no question of fact here about the medical treatment at all. When Judge Muzz was faced with a longstanding history of knee pain going back to 2002, I believe, treatment for knee pain, diagnosis of severe arthritis, discussion of surgery, knee replacement, the ultimate or most severe operation for knees you can have, discussion of knee replacements for both knees, and an actual left knee replacement, all outside the statute of limitations. All that is undisputed and outside the statute of limitations. When faced with all that, and with Seventh Circuit opinions right on point that say that the issue is when an injury presents itself, here there's no dispute, it presented itself, and there's no dispute of the seriousness of it. Then the plaintiff has an affirmative duty to investigate, and the Seventh Circuit says it's an objective analysis. It's not question of fact. It's not let's find out what the doctors have to say. It's an objective analysis by the court. Judge Muzz enters a seven-page, well-reasoned decision putting an end to this case, which is exactly what he's supposed to do. And he does it because the law is overwhelming on this, and the plaintiff submitted the law that applies. First of all, this is... So you don't dispute that the doctor never tied or broke anything that said injury is work-related or possibly work-related? Because he contends the only time he started figuring this out was when he talked to his co-workers, right? Yes, sir. We don't dispute that there's nothing in the record that a doctor told him it was related to work. And despite what counsel says on the other side, the King v. National Railroad Passenger Corporation, that's the Amtrak, King v. Amtrak case, 2008 on the Northern District of Illinois says, as to that plaintiff, whether King knew the actual cause of her knee injury at the time the injury manifested itself is not relevant to this court's inquiry concerning the accrual. Then they go on to say what is relevant is the objective inquiry into what happened. What did the plaintiff do? It's not relevant what the doctor told him. It's what the plaintiff did when he got this diagnosis. And that's what is so overwhelming about the case law and then the facts as we apply to this case. I mean, the statute of limitations, first of all, in FELA is a condition precedent to filing a suit. It is not an affirmative defense, although we plead it so we're able to pursue it. But it is a condition precedent under the Emmons case. The plaintiff, not me, the plaintiff, bears the burden of approving this plaintiff's time to file. That's also unusual because it's a statutory cause of action. And then there's the discovery rule, and that is that the claim approves when the plaintiff knows or should have known in the exercise of reasonable diligence the facts of his injury and its cause. Here they've admitted, just flat admitted the injury, and the only question is on an objective inquiry of the cause should the plaintiff have done something more than he did. And the case law, again, is overwhelming on this. Constructive knowledge, an objective inquiry is all that is needed. And again, I'm repeating myself, but it's an objective standard. It is not enough just to say, oh, it's a question of fact. It's whether he reasonably should have known the cause of the injury. Exactly, sir, exactly. That is really what we're talking about. And he gave an explanation or pled an explanation, which was he found out after talking to his coworkers in 2009 or whatever. Well, he said that he talked to his coworkers in 2009, seven years after he retired. As the trial court said, that is no explanation. There's been no explanation offered as to why he didn't inquire in 2002, in 2004, in 2006 at the time of the knee replacement. And that's one of the things that the trial court found, which is unchallenged here, that there has been no explanation. Well, your opposing counsel makes a good point, I think, on the fact that this is a repetitive trauma case, and causation is always a huge issue in a repetitive trauma case. You know, what about that? I mean, doctors, no doubt in this case, if it were to go to trial, will disagree about what the cause of his knee injury was. Your Honor, that is the exact issue that the Seventh Circuit Opinions and Freeze and Pulse have dealt with, and that is the exact issue that in 2008 the King Court dealt with. And again, the actual cause is not relevant to the court's inquiry. Whether the doctor is going to argue about it later is not relevant. It's what did he do at the time, and did he inquire at the time, and did he ask, is at least one of the potential causes, not the cause, is at least one of the potential causes work? And in every one of these cases, in Tolston, in Freeze, and in King, they say you've got to ask. You cannot retire from work. You cannot retire from work on August 1, 2002. You can't have treatment. You can't have a diagnosis of severe degenerative arthritis. You can't have a discussion of knee replacement surgery and then actually have the knee surgery all outside the statute. Your time is wrong. So what you would say is the standard is that he reasonably should have known that work was a possible cause. Exactly. It is a potential cause, I think, is what the cases say. Possible is probably the same thing. It's one of many causes. So under that standard, pretty much, you know, from the time that he's diagnosed with the injury, that's it. Three years later, he's out. I think if you read those cases from the time he's diagnosed with some type of real severe injury, the cases that back off that he's talking about, the cases that back off from this analysis are cases that he cited. There are cases, first of all, the green case. Okay, just a minute. But, I mean, here's the thing. I mean, if anybody's working eight hours a day, whatever, and they've got the rest of their life they're living, and then they get injured, you know, under that analysis, everybody would have to at some point say work might have had something to do with this. So there would be no situation where it would ever be a factual issue if the three years had run. If anybody addresses to the point of a knee replacement and discussions of knee replacement and severe general arthritis, all while outside the statute, yes, sir. That's what Fries and Polson said. I mean, that's the facts here. Yes. And the flip side is where they haven't followed this. What the plaintiffs talked about is where there's been some kind of intermittent, where somebody might have a bump or some pain. In the green case that they placed so much reliance on, they said that the treatment outside the statute was, in quotes, a little more than a scratch. And on Sackett and Nichols, the cases that they rely on and say there's this big moving backwards, those cases, the whole issue was intermittent pain versus constant pain. So there you've got it, the manifestation issue. And we just don't have that here. We've got a – and this is the court's order. This is not me. We've got a seven-page order from the court, and this is uncontested. The plaintiff has not contested any of this. This is not a question of fact. He retires on August 1st, 2002. On July 24th, 2006, outside the statute, comes in with bilateral knee complaints. History. This has been going on for years. Historically, the right knee was worse than the left. More recently, the left knee has been worse than the right. It locks up on him. It bothers him with every step he takes. It wakes him up at night. He walks with a limp. He's been taking Vicodin because of the pain. It goes on. I'm sorry, I'm bored, everybody. It goes on to say impression, severe degenerative arthritis, bilateral knees. Right now, left is more somatic than right, but it's severe in both. Plaintiff wishes to set up total knee replacement. That's July 24th. August 23rd, as for the left knee, he has the actual knee replacement outside the statute of limitations. On the right side, it's actually worse for the plaintiff. It starts on July 1st, 2004. Bill is here today for a knee pain. This is out of the court order. He had it for about six to eight months, and it seems to be getting progressively worse. Osteoarthritis in the knee. Needs a knee, possibly needs a knee replacement. We'll start him on Bextra 10 milligrams twice a day and give him over to Dr. Ryan's office, that's the specialist, for further evaluation. Then he has an x-ray in 2004, and it is moderately advanced osteoarthritis right knee. A handwritten note says severe arthritis in the knee. Then we go to June 1st, 2006. He's here today for chronic knee pain and dyslipidemia. Then we go to July 24th, 2006, which we read earlier, where he walks with a limp. It wakes him up at night. That's both. And then, if it isn't enough, then we go to December 18th, 2006. Again, outside the statute. Comes in today for his right knee. He is limited more by his right knee, but not to the point where he's ready yet to do anything. He's thinking after the holidays, after the first of the year. Then in February of 2007, he's there. Chronic right knee pain, secondary arthritis. He's scheduled to have a second knee replacement done probably May. It's all outside the statute of limitations. And this is – there's no question of fact that this is all – none of this has been disputed. It's all in the records, supported by medical records. And under Freeze and Tolston, we get to a point where the injury, as Gary Scholar has admitted, is not the issue. It's did he have an affirmative duty to investigate? The law says yes, he did. Of course he did. And was that affirmative duty to investigate satisfied here? And when you look at Freeze and Tolston under an objective analysis, in the Freeze case, the guy hadn't even gone to a doctor yet. In the Tolston case, I believe they hadn't had any type of surgery. And what they did in Tolston, if I remember correctly, in Tolston, they actually filed suit within three years of the surgery, thinking that was enough. And the court said no. Now, here we have surgery outside the statute of limitations. And we have – on the other hand, we've got discussions of surgery outside the statute of limitations. And under – and the court doesn't even put in its record, because it doesn't think it needs anymore, the fact – and we put it in the record – the fact this guy was on prescription medication from 2004 all the way up to May 7, 2007, all outside the statute of limitations, to the point where he is taking Vicodin every day for his knee pain outside the statute of limitations. So the trial court says it better than I do. In its analysis here, it says – this is the court, again, not me – in sum, the plaintiff was diagnosed with severe degenerative arthritis in both knees on July 24, 2006, almost four years after his retirement from the railroad. His employment and retirement status were noted at such time in the medical history. He underwent a total left knee replacement later on August 23, 2006, and from December 2006 up until his total right knee replacement in November 2009. He continued to see his doctors for right knee issues as early as December 18, 2006. The plaintiff discussed scheduling the right knee replacement but didn't elect to do so – didn't elect to do it. This case is so strong under these cases that – and there isn't a question of fact. In fact, it would be – to the extent it's been suggested, a question of fact somehow follows this. It's not a proper analysis because it is objective. It's an objective standard. So here we would say very simply that his conditions had obviously progressed to the point where he actually had the surgery. If there's any question in the agreement on second cases about intermittent treatment or just being a scratch or something you can leave alone, that's not this case because he actually had a severe – a diagnosis of severe degenerative arthritis and a knee replacement outside. These facts under this case law triggers the plaintiff's affirmative duty to investigate, and he doesn't file suit until August of 2010. I don't believe there's any meaningful consideration given in the appellant's brief to the trial court what the trial court did here. They're just saying there's a question of fact, and they're saying he didn't have actual knowledge of the cause, which is a non-starter. That's not the standard here. It would be a different case if we had the flip side if the doctor told him this was not caused. If the record reflected that the doctor said this was not caused by your work, it would be a different case. We don't have that. I think you're exactly right. Because then he would be saying I investigated and I was told. I think Judge Stewart, you're exactly right. But we don't see it either way in the records here. Right. Okay. I think that's right. I mean, we've been through this. If anyone has any questions, I'll be happy to answer them, otherwise I'll sit down. Thank you, counsel. Thank you. Mr. Schneller, you have the model, sir. I'm not here to beat the dead horse, but what I think the railroad is confusing is the amount of treatment or what treatment was done, whether there's a surgery or the plaintiff just sees the doctor a few times. I don't think that matters. What matters is, and the question here is whether the plaintiff reasonably should have known it was caused by his work. I can tell the court I've never worked for the railroad. My dad will tell you that I've never worked a day of my life, and I have knee problems. He went to a professional. He went to two professionals. He told them what he did for a living. They didn't relate it to his work. Boiled down, the question is, is the duty for the plaintiff? But we don't know what the doctor's related it to. The record doesn't reflect any causation opinion by the doctor. That's correct. We don't know. But we do know that he told them he was a railroad conductor for so many years, since 1969. And so how far do we push this? Are we going to give a railroad worker the duty to have to ask what caused this every time? Does he have to ask the causation question to a reasonable degree of medical certainty? I don't think we can expect a railroad worker to know to ask that. And that doesn't just go for railroad workers. As I think about this, I think, well, would it be different with carpal tunnel? I mean, that's kind of out there more, and you kind of, as a lawyer, I know certain jobs that might cause those problems. But I don't know that we can expect the general population or a railroad worker to know that, to know he should ask what caused this, particularly when the injury comes to light, when the pain starts happening after he's retired. It's not getting worse day by day as he goes to work or goes through his work week. He's retired. If there's no questions, I'll sit down again. Thank you.